## Central Kentucky Traction Company v. Miller.

(Decided February 23, 1912.)

Appeal from Fayette Circuit Court.

·Street Cars—Injury to Motorman—Emergency.—A servant of the company employed for other duties who undertakes to run a car as motorman at the request of the motorman, can only recover for an injury received while so running the car if an emergency in fact existed rendering it necessary for him to take the place of the motorman. He cannot recover if he only had reasonable grounds to believe that the emergency existed when in fact there was no emergency.

JOHN R. ALLEN, ALLEN & DUNCAN and STOLL & BUSH for appellant.

SCOTT & HAMILTON and HUNT, BULLOCK & HUNT for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON— Reversing.

Liston B. Miller was a conductor in the service of the Central Kentucky Traction Company, and on August 30, 1908, was injured in a collision between the car he was on and some other cars which had been left standing on the track. He brought this suit to recover for his injuries. The proof for him on the trial showed these facts: He left Lexington for Versailles at 11 p. m., and was ordered by the dispatcher to return from Versailles to Lexington that night so as to be able to take out a car early next morning. His car was a regular car but an extra followed it. When he reached Versailles he got on the extra car which had orders to return to Lexington that night. They left Versailles for Lexington at 12:05. When they were about a mile out of Versailles the motorman became sick, was pale and looked weak; he asked Miller to operate the car for him as he was sick.

Miller then took the motor bar and began operating the car. The motorman went to the side of the car and vomited. When they reached Anglin avenue, in Lexington, the motorman said to Miller that he felt better and Miller turned the car over to him at his request. When they reached Broadway the motorman again called to Miller saying that he was too sick to run the car and asked him to take charge of it. He ran it to Union and Broadway where at the request of the motorman he again turned the handlebar over to him. The motorman then ran the car to Main and Limestone streets, where he again said to Miller that he was too sick, that he could not go to the barn with the car and Miller would have to take the car in for him. Miller took charge of the car again and when he reached Fourth street where the mortorman lived, by an agreement between them the motorman got off, Miller slowing down the car for that purpose but not coming to a full stop. Miller ran the car on toward the barn. Between three and four squares beyond where the motorman got off, but before they had reached the car barn, the collision occurred and Miller was badly hurt. The track at that point was owned by the Lexington Railway Company, but the Bluegrass Traction Company and the Central Traction Company under an arrangement with the owner ran their cars over it. Each of the three companies were under the same management, each had the same dispatcher and the same superintendent. They all used the same barn. The cars into which Miller ran had been placed upon the track by the servants of the Bluegrass Traction Company acting under the orders of the same superintendent who had ordered the car Miller was on to return from Versailles to the car barn that night. The headlight of the car Miller was on was burning badly. An automobile passed just before he reached these cars which threw up considerable dust so that Miller, although on the lookout, could not see the cars in front of him until he was right on them. Miller, while by employment a conductor, had previously run cars from the central station to the barn and understood how to manage them. The train dispatcher left his office at twelve o'clock at night and there was no way to communicate with any officer of the defendant after the motorman became sick and unable to operate the car.

On the other hand, the proof for the company was to the effect that the motorman simply felt badly but was

able to operate his car; that he did not request Miller to operate it for him but that Miller requested him to let him run it, and the motorman sat by him on the stool while he was running it until they reached Fourth street where the motorman asked Miller to take the car into the barn for him as Miller lived near the barn, so as to save the motorman the walk back home from the barn. The conductor who was in the car testified that the motorman was not sick so far as he knew; that he had heard nothing of his being sick and that he did not know that Miller was operating the car until they reached Fourth street, where he heard the motorman from the ground call to Miller and ask him to take care of his tool box for him. The defendants' proof was to the effect that Miller was not ordered to return to Lexington that night, but came back of his accord to avoid the expense of staying at Versailles. The proof for the defendant also showed that the headlight was good and that there was an express rule of the company forbidding a motorman under any circumstances to turn over his handlebars to another, and requiring him if for any reason he had to leave the car, to take his handlebar with him so that no one could operate the car while he was off it. On the other hand, there was proof by the plaintiff to the effect that it was customary for the conductors to operate the cars when the motorman was eating his lunch or for any reason he was temporarily disabled, and this usage was known and acquiesced in by the officers of the defendant.

On this proof the court instructed the jury in substance (1) that if Miller was rightfully operating the car as motorman and while he was so operating it and exercising ordinary care, it collided with the freight cars, negligently left on the track by the defendant, they should find for the plaintiff; (2) that unless they so believed they should find for the defendant; (3) that if the motorman on the car became so ill that he could not in safety to himself and in safety to the car and its passengers or crew operate it, or if the plaintiff believed, and had reasonable grounds to believe this, and that it was necessary that the car should be moved and it was impracticable to obtain orders from the officers of defendant what steps to take toward supplying the place of the motorman, then the plaintiff, so long as these con-

ditions existed and no longer, was rightfully the motorman upon the car; (4) the plaintiff could not recover if he failed to exercise ordinary care in operating the car; (5) if the cars with which the collision occurred had been negligently left on the track by the servants of the Bluegrass Traction Company, such servants for the purposes of this action were the servants of the defendant. The jury found for the plaintiff fixing the damages at $12,-000. The court entered judgment on the verdict and refused a new trial. The defendant appeals.

The defendant asked the court to instruct the jury that they could not find for the plaintiff unless they believed from the evidence that at the time the motorman left the car at Fourth and Limestone streets, he was by reason of sickness unable to run the car, and it was for this reason necessary to get Miller to run the car to the barn. The court refused to so instruct the jury, and by the instruction which he gave allowed Miller to recover although no emergency in fact existed, if Miller believed and had reasonable grounds to believe that the emergency existed.

In determining the rights of the parties we must carefully bear in mind the relation in which they stood. While Miller was in the service of the company as conductor, he was not the conductor of the car on which he was riding; he had no duty to the company to perform on that car; under his own evidence he was simply ordered to return to Lexington on that car. In so far as he took any part in running the car he was simply a volunteer unless an emergency arose, requiring him to run the car. The rule is that a person who is not authorized to perform as a servant the work in which he is injured, can not recover of the master if he is injured, damages for his injury, because the master not having authorized him to act owes him no duty. There is an exception to this rule where the injured person is an emergency assistant acting at the request of an employe, who has under such circumstances, authority to request his assistance, although ordinarily he is not invested with such power. (2 Labatt on Master and Servant, section 631.) Thus in Sloan v. Cen. Iowa R. R. Co., 62 Iowa, 728, a conductor whose crew was short, requested a third person to act as brakeman on his train, the regular brakeman being absent. It was held that the con-

ductor though not ordinarily authorized to hire brakemen, had authority to supply the place of the absent brakeman for the time being. The same principle was applied in Aga v. Harbach, 127 Iowa, 144, where an engineer requested another to help him adjust an electric light in the engine room. In Georgia Pac. R. R. Co. v. Propst, 83 Ala., 518, one of the brakemen on a train became violently sick, and the conductor requested a third person to act as brakeman in his place. It was held that the person so acting in the emergency could recover for an injury received. In L. & N. R. R. Co. v. Ginley, 100 Tenn., 472, the conductor in an emergency requested a third person to help him when his brakeman was otherwise employed, and could not make a coupling. A recovery by the person who was thus injured was sustained. There are also numerous cases holding that a person is not a volunteer if he assists the servants of the defendant at their request in doing work in which he is interested, and while so acting is injured by the negligence of the defendant. This has been applied in cases in loading freight and in favor of passengers on cars where an accident had occurred or by reason of some other emergency it was necessary that the passengers should assist the servants of the railroad company. (Eason v. S. E. T. R. R. Co., 65 Tex., 577, and authorities cited.) But we have not been referred to any case in which a recovery has been allowed by one who assisted a servant at his request when no emergency in fact existed and the servant was without authority to employ assistance. We do not think that such a rule should be applied on the facts of this case. From the time the car left Versailles until about the time that the motorman got off at his house, the conductor, the motorman and Miller were the only persons on the car. About the time the motorman got off, a trespasser got on to ride down to the barn, and he was the only other person on the car. The conductor and the motorman were in charge of the car. If the motorman became disabled it was incumbent upon the conductor to take charge of it. Miller was under no responsibility for the car. The conductor was not consulted. Miller simply took charge of it at the request of the motorman and should be regarded as a volunteer unless the motorman was in fact so sick that he could not safely operate the car. It is true there is proof by Miller that the conductor had not long been on the road and did not understand how to operate a car.

Still he was in charge of it, and he knew nothing of any disability on the part of the motorman or of his intention to leave the car until he had left it. It is true that he then allowed Miller to operate the car down toward the barn, but as the motorman had been left behind in view of the short time that elapsed before the collision, Miller should be regarded as simply a volunteer, unless in fact the motorman when he left the car at Fourth and Limestone under the arrangement between him and Miller was too sick to operate it safely to the barn. In other words, Miller can not recover unless he acted in an emergency, and it was for the jury under all the facts to say whether or not an emergency existed. The fault with instruction No. 3 given by the court is that the court thereby left it to Miller to decide whether an emergency existed when this question was for the jury and not Miller. This instruction with the words "or if the plaintiff believed and had reasonable grounds to believe that such motorman had become and was so ill" omitted, expresses our idea of the law upon this point. The court should have instructed the jury on this point in substance as above indicated.

By another instruction the court will tell the jury that if the motorman got off the car at Fourth and Limestone streets and Miller then took charge of the car to operate it to the barn for the accommodation of the motorman, when the motorman was not in fact too sick to safely operate the car to the barn, they should find for the defendant.

Instruction 5 is also complained of, but we do not see that it was improper under the facts of the case. The defendant by its dispatcher had ordered this car to return from Versailles to the barn. Having given this specific order it was the duty of the defendant to exercise ordinary care to keep the place where the servant was to work reasonably safe. While this duty rested upon it, the superintendent who had charge of this car ordered the other cars taken out and gave the men who were to take them out no warning of the coming of the other car, or direction to keep the track clear. No care was taken to keep this track clear for the car which had been ordered to run over it. The court, therefore, properly held that the defendant was liable for the obstruction of the track. The court did not err in refusing to instruct the jury peremptorily to find for the defendant.

There was sufficient evidence that the mortorman was too sick to operate his car to take the case to the jury, and in view of the short distance from Fourth and Limestone streets to the barn, and the usage prevailing in such cases, if the emergency really existed, the plaintiff was an emergency assistant. We have examined the cases of Gamble v. Akron R. R. Co., 63 Ohio State, 352, and L. & N. R. R. Co. v. Hays, 128 S. W., 289. Neither of these cases are in any manner applicable to the question that we have considered; in neither of them was the question of the right of a volunteer to determine whether or not an emergency existed, presented or decided.

Judgment reversed and cause remanded for a new trial and for further proceedings consistent herewith.

Whole court sitting.

Judge Nunn dissenting.

### DISSENTING OPINION BY JUDGE NUNN.

The lower court instructed the jury, in substance, that if Miller was rightfully operating the car and exercising ordinary care when the collision occurred, to find for him, and that if they believed from the evidence that the motorman on the car became so ill that he could not in safety to himself, the passengers, the crew and the car, operate it, *or if the plaintiff believed and had reasonable grounds to believe this* and that it was necessary for the car to be moved and it was impracticable to obtain orders from the officers of defendant with reference to what steps to take in supplying the motorman's place, then plaintiff, so long as these conditions existed, but no longer, was rightfully the motorman upon the car. The opinion of the court condemns the language above which is italicized, and only allows appellee to recover in case the motorman was *actually* sick and unable to run the car. The court says that it has been unable to find any authorities condemning this language in the instruction. I do not believe any court, out of this State will ever condemn a proposition so just and reasonable. What does it mean? It simply means that if the jury believed from the evidence that Miller believed and that he had reasonable grounds to believe, that the motorman was too ill to run the car, they should find for Miller, as an emergency then existed which authorized him to run the car. The opinion eliminates Miller's right to act upon what he believed and had reasonable

grounds to believe the existing condition was, and holds that unless Miller actually knew that the motorman was too sick to operate the car, he had no right to take charge of it, and he should not, therefore, be allowed to recover unless he knew positively that the motorman was too sick to manage the car.

The accident happened after midnight when those in charge of the car could not get in connection with the superintendent who sent them out and by whose directions the cars collided with were negligently placed upon the track. , Those in charge of the car had been directed to bring it back from Versailles to Lexington and put it in the car barn. The testimony shows, without contradiction, that the regular motorman was sick. Miller testified that he was very pale; that he looked weak and was hardly able to hold his head up; that he vomited four or five times while going to Lexington, and that he asked him, on account of his condition, to run the car for him. The motorman testified that he was sick, but not so much so as he could not have run the car into the car barn. He said nothing about having vomited while going from Versailles. He also testified that he was familiar with the rules of the company, and that did not authorize him to turn his motor bar over to another unless he was sick; but said nothing about how sick he would have to be before he could do this, nor as to who was to determine that he was sick and the extent of his sickness. While it does not expressly say so, the effect of the opinion is that before Miller could be sure of his right to take charge of the car he would have to send for a competent physician and have him examine the motorman and determine whether or not he was too sick to operate the car, and then, if it should afterwards turn out that the motorman was not too ill to manage the car, Miller could not recover for an injury received, it matters not how honest his belief and how reasonable the grounds upon which it was founded, as the opinion requires positive knowledge upon his part. To show the absurdity of this holding, we will suppose a case: While a train is passing through the country a shot is fired from the woods and the engineer falls, instantly, from his seat and has all the appearances of having been shot. The fireman takes charge of the engine at once and soon afterwards runs into some cars that have been negligently left upon the track, and is injured. Now the

court's opinion in this case is to the effect that the fireman could not recover unless the engineer was actually shot and rendered unable to operate the train. They would not let him recover no matter how honest his belief that the engineer was shot, nor how reasonable his grounds for believing. This court holds that before he is authorized to take hold of the throttle he must know positively that the engineer was shot, which, to my mind, is absurd. In the supposed case, if the fireman knew that the engineer was shamming, he could not recover if injured while operating the train, nor should Miller be allowed to recover in this case if he knew or had reasonable ground to believe that the regular motorman was shamming, or feigning, therefore, it was necessary for the court to submit to the jury the question whether or not he had reasonable ground to and did believe that the regular motorman was sick. In the case of L. & N. R. R. Co. v. Hays' Admr., 128 S. W., 289, the company claimed that Hays was violating its rules when he met his death and appellee claimed that Hays believed he was doing his duty for the company. In commenting upon that idea, Chief Justice Hobson, in writing for the court, said:

"In the case of the servant the question would be simply were the circumstances such as to justify a man of ordinary prudence in regarding the thing as a part of his duty."

In that case the court did not require the servant to know what facts actually existed before he was authorized to act for his master. In the case of Gamble v. Akron, Bedford & Cleveland Railroad Company, 63 Ohio St. Rep., 352, the conductor took the place of the motorman while he ate his dinner, but the motorman did not come out after he finished his dinner so the conductor continued to operate the car. The dispatcher ordered them out with the car and also sent a snow plow out on the same line. While the conductor was operating the car, he came upon the snow plow on a sharp curve, collided with it and was killed. The company contended that the motorman was a volunteer and was violating the rules which provided that the motorman should not turn his car over to any person and the conductor should not be permitted to run it. The lower court decided against the conductor, but the Supreme Court of Ohio, after reviewing the facts of the case, said that the evi-

dence would have justified the lower court in directing a verdict for him. The rules for running a car in that case were the same as those in the case at bar. They stated that if an emergency, such as sickness, etc., existed, the motorman had a right to turn his motor bar over to another. The court also said in that case, that,

"So far as appears here, there was no violation of either the letter or the spirit of these rules construed together, when Walborn temporarily exchanged places with the motorman that the company's property or the safety of passengers was in any way imperiled by this arrangement, and there was no occasion to apprehend an emergency which would call for them to be in their respective places. It would seem that in this instance the conductor exercised his judgment and authority, under the rules, reasonably and prudently. This case is not therefore akin to those cases in which a servant voluntarily and needlessly, and not in the performance of duty to the master, places himself in a position of great peril. But, if it be conceded that Walborn was in a prohibited position at the time he was fatally injured, it seems to us that the same result must be reached. The blunder of the train dispatcher put everybody on the train in peril. His act was the sole and proximate cause of the collision. Not a thing that Walborn did contributed to bring about a collision, and he heroically died at his post in trying to prevent it. Nothing is alleged against him, except that he was in the most dangerous position, where all were in common danger, without the fault of any. Under such circumstances, it is nothing short of absurdity to contend that, because he was killed instead of another, or possibly all, the company should escape all liability for its wrong. But it is argued that he should have deserted his temporary post, and have gone back to his proper position; in other words, that he was negligent in remaining. But, if he had run away without attempting to reverse, and the people on the car had been killed or mangled, would any court acquit the company of negligence in that respect? If the contention of counsel is correct, it involves the contradiction that Walborn was negligent in remaining, and would have likewise been negligent if he ran away. Who, among us, is sufficient for the decision of such things in an emergency? We are not willing to accept it as a law that a motor engineer or locomotive

engineer is guilty of contributory negligence merely because he remains in his dangerous position, and continues his efforts to avert calamity, from the passengers behind him. Beach Contrib. Neg., Sec. 42. And Walborn was, for the time being, the motor engineer of that car, and as such responsible for the safety of the passengers being carried therein. We find no prejudicial error in the record. It was hardly necessary to have bothered with the elaborate charge and request to charge in this case.''

It appears in that case that court recognized the right of the conductor to exercise his judgment as to the emergency even when the regular motorman was sitting in the car after finishing his dinner. In my opinion, appellee in the case at bar had a right to judge as to whether or not an emergency existed, and if he had reason to believe, and did believe that such existed he had a right to run the car to the barn where it was ordered to be placed by the superintendent, especially as regular motorman had left the car and he was the only one on it who could operate it.

In the case of Poillion's Adm'r v. Louisville Ry. Co., 140 Ky., 707, the railway company claimed that Poillion received his injuries while violating a rule that prohibited him from going on the platform. In the case the court said:

''But a conductor who has charge of a car may go on the outside when called to do so in the discharge of his duty, *or when he has reason to think it necessary in the discharge of his duty.*''

Applying the principles of the foregoing case to the case at bar, it is clear that Miller was acting rightfully and lawfully at the time of his injury. The cases referred to in the opinion by the court sustain this view. In the Tennessee case the conductor, in an emergency, requested a third person to help him when his brakeman was otherwise engaged and he could not make a coupling alone, and this third person was allowed to recover from an injury received, although the conductor had no right to employ him except in a case of an emergency. Does any one think the court would have refused to allow him to recover if it afterwards turned out that the regular brakeman was not in fact otherwise employed at the time. If this third person had reasonable grounds to believe and did believe that the conductor

was telling him the truth, the Tennessee court would have sustained his recovery. There is a long line of decisions in this State authorizing persons to recover for injuries received while acting under the belief that an emergency exists, provided they have reasonable ground upon which to base such a belief, although it may develop afterwards that no emergency did actually exist and they would not have been injured if they had not so acted.

Aside from this, the court erred as under the facts stated in the opinion as an emergency existed when the regular motorman left the car, and he did so without the knowledge of the conductor. Miller did not have charge of the motorman; he could not control him, and when he left, Miller was the only person on the car who could run it. There were but two others, the conductor and the trespasser mentioned in the opinion, and it is in proof that the conductor could not operate the car. Under this state of facts, was it the duty of Miller to leave the car standing on the track in the street where other cars might collide with it and cause injury to persons and property, or was it his duty to take it to the barn, the place for storing cars that are not in use? Miller was an employe of the company as conductor on other cars, it is true, but it certainly would have been expected of any employe, under the circumstances, to take the car to the barn where, according to orders, it was to go, and if Miller had not done so he would have doubtless lost his employment the next morning. There was an emergency which authorized Miller to take charge of the car whether the regular motorman was too sick to handle it or not. He did leave it and left Miller and the conductor in charge and Miller was the only one who could run it. Grant that the motorman was not too sick to operate the car when Miller took charge, there is not a pretense that he was in the least negligent in handling it. There is admitted negligence, however, on the part of the company in placing the cars on the track with which he collided, as he could not see them on account of the poor light on his car and the dust stirred up by an automobile. In all probability this accident would have occurred if the regular motorman had been on and he would have been mangled and the company would have to compensate him instead of appellee.

In 20 Am. & Eng. Ency. of Law, page 106, the rule is succinctly stated thus:

"The mere fact that injuries sustained by an employe were inflicted while he was acting in disobedience of well-known rules, will not relieve the master of liability. There must be a connection between the disobedience of the rule and the injury received. The contributory negligence of the injured party that will defeat a recovery must have contributed as the proximate cause of the injury."

And there are authorities from many States cited to sustain it. In the case of Gamble v. Akron, Bedford & Cleveland Railroad Co., supra, the court said on this point:

"But, if it be conceded that Walborn was in a prohibited position at the time he was fatally injured, it seems to us that the same result must be reached. The blunder of the train dispatcher put everybody on the train in peril. His act was the sole and proximate cause of the collision. Not a thing that Walborn did contributed to bring about a collision, and he heroically died at his post in trying to prevent it."

Miller, an employe of appellant, was doing the proper thing in a careful manner, without negligence on his part, when he collided with the cars which had admittedly been negligently left on the track. I am unable to see the connection of Miller's supposed violation of the rules with the negligence of appellant and the collision so as to defeat his right to recover damages. In my opinion, this is one of the cases wherein if Miller was acting in disobedience of a rule it does not relieve the master from liability.

It is said in the opinion that:

"It is true there is proof by Miller that the conductor had not long been on the road and did not understand how to operate a car. Still he was in charge of it, and he knew nothing of any disability on the part of the motorman or of his intention to leave the car until he had left it. It is true that he then allowed Miller to operate the car down toward the barn, but as the motorman had been left behind in view of the short time that elapsed before the collision, Miller should be regarded as simply a volunteer."

Sullivan, the conductor, agreed with Miller that he had only been in the service of the company a short time and did not know how to operate a car, and he also testified that he knew when the motorman left the

car. The court indicates that the distance traveled after the motorman got off the car before the collision was very short, and that Sullivan, the conductor, therefore, did not have time to prevent appellee from running or stopping the car. The proof shows, without contradiction, that they traveled a considerable distance, at least four blocks or more, from the place the motorman got off to the place of the collision, which was certainly a sufficient distance to allow the conductor to order Miller to stop running the car, but he made no effort to do so, although, as stated in the opinion, he was in charge of the car, and his conduct after the regular motorman left shows that he consented to Miller running the car.

For these reasons, I dissent from the opinion of the court.